# STATE OF VERMONT

# ENVIRONMENTAL COURT

In re Appeal of: Ira and Martha
Jackson

&

Town of Waitsfield, Plaintiff

v.

Ira and Martha Jackson,
Defendant.

}
}
}  Docket Nos. 186-9-00 Vtec
}      and 125-8-01 Vtec
}
}
}

## Decision and Order

In Docket No. 186-9-00 Vtec Appellants Ira and Martha Jackson appealed from a decision of the Zoning Board of Adjustment (ZBA) of the Town of Waitsfield upholding the Zoning Administrator's Notice of Violation and decision disapproving Appellants' as-built application, dismissing Appellants' application under § V(9) of the Zoning Ordinance, and denying Appellants' applications under §§ IV(4) and IV(5) of the Zoning Ordinance. In Docket No. 125-8-01 Vtec, the Town brought an enforcement action against Appellants. The two matters have been consolidated. Appellants are represented by Carl H. Lisman, Esq., Christina A. Jensen, Esq. and Peter S. Sidel; the Town is represented by Steven F. Stitzel, Esq. and Amanda S.E. Lafferty, Esq.

After certain issues were decided by summary judgment, the hearing on the merits of these matters was bifurcated so that the issue of whether the watercourse at issue in these matters qualifies as a 'stream' for the purposes of § V(9) of the Waitsfield zoning ordinance could be determined first. The Town has also renewed its motion for summary judgment that Appellants are precluded from contesting that the watercourse is a stream, because they did not appeal the ZBA's 1998 approval of a reduction in the stream setback. The Town argues that Appellants' application, and the ZBA's approval of that reduction, necessarily though implicitly determined that the watercourse was a stream, and argues that Appellants are precluded by 24 V.S.A. § 4472(d) from contesting that determination in the present appeal. The Town's renewed motion is denied on the same basis as this issue was denied in the original motion ruling. The earlier proceedings assumed but did not determine that the watercourse was a stream, and therefore under the circumstances of this case § 4472(d) does not preclude raising this issue in the present proceedings.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who also took a site visit in late November 2001 with Attorneys Jensen and Lafferty. A second site visit, arranged for Judge Wright to take alone during a period of spring runoff in 2002, ultimately did not receive permission of the Appellants and will be disregarded. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon

consideration of the evidence, the site visit, and the written memoranda and proposed findings, together with the undisputed facts from the summary judgment decision, the Court finds and concludes as follows.

Appellants own an approximately 7.3-acre parcel property, including a single-family residence and what was formerly an existing shed or barn (and before that, a water-powered mill), on Route 100 (Main Street) in the Agricultural/Residential zoning district. Property directly across the segment of watercourse at issue in the present case, and at a steeply higher elevation, is owned by Turner. Cattle are maintained on the Turner property, and one or two cattle troughs are maintained on the Turner property, the overflow from which flows downhill and from time to time reaches the segment of watercourse at issue in the present case.

In the past, a watercourse traversed Appellants' property at a distance of from 12 to 26 feet behind (and generally northerly of) the existing barn, to serve an operating water-powered mill at that location. Other terms used to describe a supply of water to power a mill are ' flume' and ' millrace.' The term ' flume' also refers to such a watercourse conveyed in a wooden pipe or trough.

When the property had an operating water-powered mill, a pond was created on the property to impound water to power the mill. The pond was fed by a stream which was diverted by human effort from Shepard Brook upstream of Appellants' property. The original diversion of that stream, the original creation of the pond (which was smaller than the size of the pond now on Appellants' property), and the original creation of the watercourse segment at issue in the present case occurred as early as the early 19th century.

The stream diverted from Shepard Brook traveled across the adjacent property now owned by Reynolds. That stream also received water directly from precipitation events, and from ground and surface water from the higher land northerly of the Reynolds property. That stream traveled onto what is now Appellants' property in the vicinity of what is now the location of Appellants' tennis court, to feed the pond. Between the pond and Shepard Brook below the mill is the segment of watercourse or channel that is at issue in the present case. Without regard to the presence of water, the channel is several feet across (from bank to bank) and about a foot deep. It drops off steeply from the elevation of the pond to the elevation of the former mill site, and then descends more gradually to return to Shepard Brook below the former mill site. As well as receiving the outflow from the pond, that segment of watercourse receives water from snow melt, surface flow, and groundwater from the higher elevation land directly to its north, and receives water directly from precipitation events and from snow melt.

When the mill was in operation, the outflow from the pond was directed either into a wooden flume to the millwheel to power the mill machinery, and the water used by the mill returned to Shepard Brook through the watercourse below the mill, or the outflow from the pond traveled through the segment of the watercourse at issue in the present case from the pond to rejoin Shepard Brook below the mill. When the mill was in operation, the watercourse was a stream, even though its flow (or a portion of its flow) was capable of being diverted into the mill through the flume, to power the mill machinery, at the election of the mill operator.

The mill no longer exists. The wooden flume no longer exists, although remnants of its iron hoops and remnants of its supports are visible in or near the watercourse. Most importantly for the functioning of the water flow to the pond, the segment of stream from Shepard Brook across the Reynolds property was filled in at some time in the past, so that water from Shepard Brook no longer feeds the system described above, unless it is pumped there through a pipe installed by prior owners across Appellants' property. Water still flows into the small stream remaining on the Reynolds property directly from precipitation events and from surface flow and groundwater from the higher land to the north of the Reynolds property. The sources of water in this watershed have not been thoroughly investigated and may include surface runoff and of water flowing or seeping from springs and other groundwater sources. This small stream continues to flow or trickle onto Appellants' property, maintaining an alder wetland and a wet area supporting cattail vegetation, and flowing into the pond on Appellants' property.

The maximum level of the pond is now controlled by an outflow or overflow structure. This structure consists of an upright pipe about 18 inches in diameter, set in the pond near the dam, connected to a horizontal pipe near the bottom of the pond through which water is conveyed to the pond outlet visible from below the pond. The upright pipe allows water to flow out of the pond when the level of the pond reaches the top of the pipe. The top of the upright pipe is lower than the top of the berm or dam creating the edges of the pond. The upright pipe also has deteriorated so that some water flows through holes or cracks in it at lower levels. Appellants have prevented some of the unintended flow out through holes in this structure by encasing it in a plastic bag.

Former owners installed a pipe from Shepard Brook to the cattail area, through which water may be pumped out of Shepard Brook[1] into the pond during times when the pond is low.

The level of the pond fluctuates and from time to time overflows through the upright pipe into the segment of watercourse at issue in the present case. This overflow occurs even when water has not been pumped into the pond from Shepard Brook, based on precipitation events in the watershed area, snow melt, or other increased flow of surface and groundwater from the northerly higher elevation land (the watershed of the pond system) into the small stream feeding the pond. The level of the pond generally tends to be higher in the late fall and winter, through the period of spring runoff and snow melt, and to be lower in the summer and early fall, especially in periods of drought. Some of the pond water is lost through processes of evaporation and infiltration into the ground at the bottom of the pond, without implicating the overflow pipe.

Water reaches and flows through the segment of watercourse at issue in the present case from water released into it from the pond (due to overflow into the upright pipe or leakage into the upright pipe or the outflow pipe), from precipitation onto the surface of the surrounding ground and the watercourse itself, and from snowmelt and flow into it of surface and groundwater from the higher elevation land to the north. Water flow has occurred in the watercourse segment during the pendency of these applications and this litigation as shallow streamlets ranging from less than an inch to approximately six inches deep and from approximately ten inches wide to approximately two or three feet wide. The flow has left sand and silt in the bottom of the channel where the flow has occurred, but it has not flowed fast enough for a long enough period to incise or erode defined channels within the bed of the wider channel.

Water flow in the watercourse segment is not continuous year-round; therefore the watercourse segment is not a permanent stream. However, neither is it solely dependent upon immediate precipitation events (the definition of an ephemeral stream). It carries water flow from groundwater as well as precipitation and surface water sources, from time to time during the year. Taking all the evidence into account, it is an intermittent stream as the term is used by watercourse professionals.

Although originally created by the artificial diversion of water from Shepard Brook, the watercourse has functioned naturally since that time, and receives water from natural sources as well as by the recent artificial pumping into the pond or by diversion from the flume in historical times. Nothing in the Waitsfield zoning ordinance suggests that protection of ' streams' under the ordinance is in any way limited to those streams that have experienced no human interference over time.

Accordingly, the watercourse segment at issue in this case qualifies as a " stream" for the purposes of the Waitsfield zoning ordinance.

In the summary judgment decision of October 2001, the Court ruled that:

[U]nder the 1998 approvals, Appellants only held a zoning permit for a 24-foot-high structure, on a 30' x 30' footprint, with a one-foot roof overhang, for use as a barn/garage, in connection with the residential use of the property. Any changes to that permit require an application for an amendment to the 1998 zoning permit and an amendment to the 1998 stream setback reduction, which was originally approved " as indicated on [Appellants' ] plans [dated] September 29, 1998."

and concluded that

[T]he as-built project requires approval of an amendment to the 1998 stream setback reduction order, as well as approval of an amendment to the 1998 zoning permit. The ZBA should have acted on the application under § V(9)(A) rather than dismissing it, and the Zoning Administrator should have waited for the ZBA' s § V(9)(A) ruling before acting on the zoning permit amendment application.

We noted in that decision that " ordinarily a matter such as this would be remanded to the ZBA for action on the § V(9)(A) application," but proceeded to determine the merits of whether the watercourse is a stream, because if Appellants were to have prevailed on the merits of that issue, then § V(9) would not have applied to this project at all and the remand would have been unnecessary.

Accordingly, the above-captioned consolidated cases are hereby SEVERED. Docket No. 186-9-00 Vtec is hereby concluded in this Court and is hereby REMANDED to the ZBA to consider the application for amendment to the 1998 stream setback reduction order for the as-built project, and then for the Zoning Administrator to act on the application for amendment to the 1998 zoning permit.

We will hold a telephone conference on May 2, 2002, to determine whether the enforcement action, Docket No. 125-9-01 Vtec, should be closed without prejudice to its being reopened at the election of the Town at any time after those applications are ruled on by the Town, or whether the parties prefer some other resolution of that case. If the Town wishes to withdraw that complaint without prejudice to refiling after the amendment applications are finally resolved, the Court will enter an order waiving the filing fee for that subsequently filed action, to avoid the case remaining pending but inactive on the docket of the Court. The parties may submit an agreed order regarding the status of Docket No. 125-9-01 prior to the conference, in which case the conference will not be necessary.

Done at Barre, Vermont, this 23rd day of April, 2002.

_____

Merideth Wright
Environmental Judge

## Footnotes

[1]    This decision and the jurisdiction of this Court in this case takes no position as to whether such pumping from Shepard Brook requires a permit under any current state law.